Linda J. KINDLE and Michael Brewley, Plaintiffs,

v.

Peter DEJANA, John Sipala, Saddle Creek, LLC, William F. Wynperle, Jr., Atrium Management Services, Inc., Administrative Committee for the Atrium Management Services, Inc., Employee Stock Ownership Plan, Atrium Funding LLC and Atrium Management Services, Inc. Employee Stock Ownership Plan, Defendants.

14–cv–6784 (SJF)(ARL)

United States District Court, E.D. New York.

Signed 02/28/2017

Daniel Feinberg of Feinberg, Jackson, Worthman & Wasow LLP, and Aaron Siri of Siri & Glimstad LLP, for Plaintiffs.

John Snyder of John H. Snyder PLLC and Michael Geraghty of Sills Cummis & Gross, for Defendants.

## OPINION AND ORDER

FEUERSTEIN, District Judge:

 Plaintiffs Linda J. Kindle and Michael Brewley brought this class action on behalf of themselves and other similarly situated participants in the Atrium Management Services, Inc. Employee Stock Ownership Plan (the "ESOP") (Kindle, Brewley, and the to-be-identified class members collectively, "Plaintiffs") who received an allegedly deficient cash distribution following the ESOP's termination on July 1, 2011.[1] Plaintiffs allege that defendants Peter Dejana, William F. Wynperle, Jr., Atrium Management Services, Inc.

---

[1]. Plaintiff Linda J. Kindle voluntarily dismissed her claims pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii). and was dismissed from this action on February 8, 2016. (Dkt. 100). On April 25, 2016, the Court granted Plaintiffs' motion to certify a class consisting of, *inter alia*, "all persons who were participants in the ESOP when Atrium terminated the ESOP effective July 1, 2012 and/or beneficiaries of such ESOP participants at any time thereafter..." (Dkt. 114).

("Atrium"), Administrative Committee for the Atrium Management Services, Inc. Employee Stock Ownership Plan (the "ESOP Committee"), John Sipala, and Saddle Creek, LLC ("Saddle Creek") (John Sipala and Saddle Creek, collectively the "Sipala Defendants") breached their fiduciary duties to Plaintiffs and other ESOP participants in connection with the valuation and sale of ESOP assets, in violation of section 404 of the Employee Retirement and Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1104, 1132. Plaintiffs also allege that all defendants violated section 406 of ERISA, 29 U.S.C. § 1106, which prohibits certain interested-party transactions, in connection with the same sale and purchase of ESOP assets. Plaintiffs have moved for partial summary judgment on their section 404 breach of duty of loyalty claim against the Sipala Defendants, and the Sipala Defendants have cross-moved for summary judgment on Plaintiffs' section 404 and 406 claims. For the following reasons, both motions are denied.

## I. BACKGROUND [2]

### A. The Parties

Defendant Peter Dejana is the president and owner of Dejana Industries, Inc. ("Dejana Industries") and a "family" of related companies, including defendant Atrium (all such companies collectively, the "Dejana Group"), that provide municipal services such as snow removal and street sweeping. (Def. Cnt. Stmt. ¶ 1). Defendant ESOP Committee was the named fiduciary of the ESOP. (SAC ¶ 16). Defendant Wynperle was at all relevant times the executive vice president and secretary of Atrium, Dejana Industries, and other companies within the Dejana Group, and a member of the ESOP Committee. (*Id.* ¶ 15; Pl. Cnt. Stmt. ¶ 7). Plaintiffs were formerly employed by one

**2.** The following facts are taken from the parties' pleadings and their statements and counterstatements pursuant to Local Civil Rule 56.1, along with the accompanying exhibits, and are undisputed unless otherwise noted. (*See generally* Plaintiffs' Second Amended Complaint ("SAC") (Dkt. 72); Sipala Defendants' Answer to the Second Amended Complaint ("Sipala Answer"); Plaintiffs' Rule 56.1 Statement ("Pl. Stmt.") (Dkt. 117–2); Sipala Defendants' Rule 56.1 Statement ("Def. Stmt.") (Dkt. 117–42); Sipala Defendants' Rule 56.1 Counterstatement ("Def. Cnt. Stmt.") (Dkt. 117–43); Plaintiffs' Rule 56.1 Counterstatement ("Pl. Cnt. Stmt.") (Dkt. 117–65); Sipala Defendants' Reply to Plaintiffs' Rule 56.1 Counterstatement ("Def. Reply Stmt.") (Dkt. 117–84)). Where the same fact is asserted or admitted by both Plaintiffs and the Sipala Defendants, only one source is noted. Citations to paragraphs within the respective counterstatements encompass both the original statement and the opposing party's response, as well as the supporting exhibits cited therein. The Court has considered whether the parties' statement of facts are supported by admissible evidence. If a statement of fact is premised entirely upon inadmissible evidence—hearsay, for example—it is disregarded. If a proffered fact that is supported by admissible evidence is disputed only with inadmissible or irrelevant evidence, the Court treats that fact as undisputed. *See, e.g., Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that ... the district court in awarding summary judgment[] may rely only on admissible evidence.") (internal citations and quotations omitted); *Scotto v. Brady*, 410 Fed.Appx. 355, 361 (2d Cir. 2010) ("We observe that a district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence, and that the principles governing admissibility of evidence do not change on a motion for summary judgment.") (internal quotations and citations omitted); *see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (a party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment"). Where a statement of fact is controverted with a legal argument rather than a factual statement, the Court disregards the argumentative objection and treats the underlying fact as admitted. *See, e.g., Amalgamated Lithographers of America v. Unz & Co. Inc.*, 670 F.Supp.2d 214, 217 (S.D.N.Y. 2009).

or more Dejana Group companies that participated in the ESOP. (SAC ¶¶ 1, 8, 9; Def Cnt. Stmt. ¶ 5).

Defendant Sipala is an individual "who earned an MBA focused on acquisitions and turnaround situations, has senior management experience, consulting experience and transaction expertise that spans over 30 years." (Pl. Cnt. Stmt. ¶ 4). "Since 1996, Sipala . . . has been providing investment banking and consulting services to mid-market companies," and "[d]uring the course of his career, Sipala has also served in a fiduciary capacity from time to time." (*Id.* ¶¶ 3, 5). Sipala founded defendant Saddle Creek in or about 2002, and since that time "Saddle Creek has been engaged in the business of providing corporate advisory services to mid-market private and public companies." (*Id.* ¶ 1). "Saddle Creek has completed numerous acquisitions, mergers, divestitures, recapitalizations and restructurings with various mid-market companies." (*Id.* ¶ 2).

### B. ESOP Formation, Management, Assets, and 2008—2010 Valuations

In 2003, Peter Dejana and his late brother, Philip Dejana, incorporated Atrium; at that time Peter Dejana owned 93% of Atrium's stock and Philip Dejana owned 7%. (Def. Cnt. Stmt. ¶ 2; SAC ¶ 21). In 2003, Atrium adopted the ESOP, and the Dejana brothers sold their Atrium stock to the ESOP. (Def. Cnt. Stmt. ¶ 3). Peter Dejana was the president of Atrium, the trustee of the ESOP, and a member of the ESOP Committee. (*Id.* ¶ 4).

Numerous companies within the Dejana Group were participating employers in the ESOP. (*Id.* ¶ 5). Peter Dejana described the ESOP as " 'a way of giving back to the individuals who helped us build the company' and a way for Peter and Philip Dejana to get life insurance." (*Id.* ¶ 6). In conjunction with the Dejana brothers' sale of Atrium stock to the ESOP, Atrium entered into the following agreements: "(1) management services and employee leasing agreements with many of the Dejana [Group companies]; (2) insurance premium loan agreements with the Dejana[ ] [brothers] by which Atrium would advance $20 million in premiums for life insurance policies owned by the Dejana[ ] [brothers]; and (3) deferred compensation agreements with the Dejana[ ] [brothers]." (*Id.* ¶ 7).

As trustee of the ESOP, Peter Dejana was required to determine the fair market value of all assets held by the ESOP annually, and hired a firm called International Valuation Associates, Inc. ("IVA") to conduct annual valuations and file mandated Form 5500s with the U.S. Department of Labor on behalf of the ESOP. (*Id.* ¶¶ 41, 42).[3] IVA opined that the fair market value of the ESOP's Atrium stock was: $7,241,000 as of June 30, 2008; $7,376,000 as of June 30, 2009; and $7,524,000 as of June 30, 2010. (*Id.* ¶¶ 43, 44).

---

**3.** The Department of Labor describes Form 5500 as follows: "The Form 5500 Series is an important compliance, research, and disclosure tool for the Department of Labor, a disclosure document for plan participants and beneficiaries, and a source of information and data for use by other Federal agencies, Congress, and the private sector in assessing employee benefit, tax, and economic trends and policies. The Form 5500 Series is part of ERISA's overall reporting and disclosure framework, which is intended to assure that employee benefit plans are operated and managed in accordance with certain prescribed standards and that participants and beneficiaries, as well as regulators, are provided or have access to sufficient information to protect the rights and benefits of participants and beneficiaries under employee benefit plans." *See* https://www.dol.gov/agencies/ebsa/employersand-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500

### C. Peter Dejana Arranges to Purchase Atrium Stock from the ESOP

In 2011, Peter Dejana decided to purchase the ESOP's Atrium stock pursuant to the terms of a "buyout option agreement" that he had with the ESOP. (*Id.* ¶ 8). In connection with the contemplated stock purchase, Richard Shaw, a financial consultant, advised Peter Dejana to appoint a temporary trustee of the ESOP so that he would not "get into any trouble." (*Id.* ¶ 9). Additionally, the ESOP Committee desired an independent trustee for the purpose of overseeing the valuation and possible sale of the ESOP's Atrium stock to Peter Dejana. (Pl. Cnt. Stmt. ¶ 8). On April 22, 2011, the ESOP and Atrium, through Peter Dejana as trustee and president / CEO, respectively, retained Saddle Creek to serve as the ESOP's "Independent Temporary Trustee" in connection with the valuation and potential sale of the ESOP's Atrium stock to Peter Dejana. (Def. Cnt. Stmt. ¶ 10). The Saddle Creek engagement agreement provides, *inter alia*, that "John Sipala, Managing Director of Saddle Creek..., will act in [the] capacity" of Independent Temporary Trustee, and that the Sipala Defendants were to "[s]elect an independent valuation firm" to value the ESOP's Atrium stock holdings and to "[r]epresent the ESOP in its negotiation to sell the stock of Atrium to Peter Dejana." (*Id.*). Peter Dejana created Atrium Funding LLC ("Atrium Funding"), which he owns, for the purpose of purchasing Atrium shares from the ESOP in 2011. (*Id.* ¶ 11).

### D. The Sipala Defendants Retain M & S to Value the ESOP's Atrium Stock and the ESOP Sells its Atrium Stock to Atrium Funding

Upon entering the April 22, 2011 engagement agreement with the ESOP and Atrium, the Sipala Defendants contacted four potential valuation firms: Mercer Capital; Marshall & Stevens, Inc. ("M & S"); KPMG LLP; and Duff & Phelps. (Pl. Cnt. Stmt. ¶ 16). In a June 3, 2011 letter to Wynperle, Sipala indicated that: KPMG and Duff & Phelps were unresponsive and/or unable to provide the proposed valuation services; Mercer could complete the proposed valuation assignment in approximately eight weeks at a cost of $30,000; and M & S could complete the proposed valuation assignment in approximately three to four weeks at a cost of $26,500. (*Id.*). By way of an engagement letter executed on June 17, 2011, the Sipala Defendants selected M & S to conduct a valuation the ESOP's Atrium stock holdings and to "issue [an] opinion as to the fairness of the proposed transaction to purchase all of the shares of Atrium ... owned by the ESOP." (*Id.*; Def. Cnt. Stmt. ¶ 45).

On or about May 1, 2011, a M & S employee by the name of Steve Susel sent Sipala an email indicating that he had seen the ESOP's 2008 Form 5500, which made reference to IVA's $7,241,000 valuation of ESOP's Atrium stock as of June 30, 2008 but contained no analysis, and requested access to the 2009 Form 5500, but there is no indication that he or anyone else at M & S accessed or reviewed any subsequent Form 5500s. (Def. Cnt. Stmt. ¶ 46; Pl. Cnt. Stmt. ¶ 32). In June 2011, M & S provided Sipala with a document request list, which set forth various categories of financial documents relating to Atrium, including "copies of any prior appraisals." (*Id.* ¶ 47; Pl. Cnt. Stmt. ¶ 25). After receiving M & S's document request list, Sipala had a telephone call with Gregory Feldman and James Sieman of M & S during which, according to Sipala, they discussed the list. (Pl. Cnt. Stmt. ¶ 26). Though Sipala contends that during the phone conversation "M & S amended the list by supplement-

ing certain items and removing certain items," neither Sieman nor Feldman testified to that; during his deposition, Sieman could not recall whether he and Sipala had discussed M & S's request for prior appraisals. (*Id.* ¶¶ 27–28). Sipala made various handwritten amendments to M & S's document request list, including crossing out the request for "copies of any prior appraisals," among other things, and sent the list containing his handwritten amendments back to M & S on July 1, 2011. (Def. Cnt. Stmt. ¶ 47). Mr. Sipala testified that he "did not want to give [M & S] prior appraisals" because he "wanted to get their fair market value on a completely independent basis" and "didn't want them to have … that bias in any way, shape or form … by seeing the appraisals." (Pl. Cnt. Stmt. ¶ 30; Def. Cnt. Stmt. ¶ 47). While Plaintiffs and Defendants dispute the reasons for and propriety of M & S not reviewing IVA's previous valuation reports, there is no dispute that the Sipala Defendants did not provide M & S with the IVA valuation reports from 2008, 2009, and 2010 and that M & S never reviewed those reports. (Def. Cnt. Stmt. ¶ 46; *see id.* ¶ 47; Pl. Cnt. Stmt. ¶¶ 25–31).

At unspecified times following Sipala's provision of certain financial documents to M & S in response to their requests, "M & S provided Sipala with drafts and schedules and, ultimately, a draft valuation report," and "Sipala reviewed the content of each of the drafts and schedules." (Pl. Cnt. Stmt. ¶¶ 40, 41). At unspecified times, "Sipala also had several telephone conferences with M & S and [Richard] Unger [Atrium's CFO and a member of the ESOP Committee] in which he asked M & S numerous questions regarding the methodology M & S employed and M & S's analysis of Atrium's financials, assets and liabilities." (*Id.* ¶ 42; *see id.* ¶ 33). In its final appraisal report dated November 30, 2011, M & S opined that the fair market

value of the ESOP's Atrium stock was $4,190,000 as of October 31, 2011. (Def. Cnt. Stmt. ¶ 48).

Peter Dejana and Atrium Funding retained Robert S. Moran, a lawyer affiliated with the law firm McBreen & Kopko who was "the longtime attorney for the Dejana [Group] [c]ompanies and ha[d] provided legal services to [Peter] Dejana on multiple occasions over the years," to represent Atrium Funding in connection with its purchase of Atrium stock from the ESOP. (*See id.* ¶¶ 13, 18 51). At all relevant times, Moran and the Sipala Defendants occupied the same small office suite in Montvale, New Jersey. (*See id.*; *see also id.* ¶ 12). By way of a hand-delivered letter dated December 6, 2011, Moran, on behalf of Atrium Funding, offered the ESOP $3,500,000 for the entirety its Atrium stock holdings (100% of Atrium common stock). (*Id.* ¶ 51). On December 9, 2011, the Sipala Defendants hand-delivered a response letter to Moran, indicating that, while "a purchase price of $3.5 million would. be unacceptable," the Sipala Defendants "would feel comfortable recommending an offer with aggregate cash consideration of $4.6 million at closing." (*Id.*). Notwithstanding the counteroffer of $4,600,000, the Sipala Defendants concluded their seven-sentence letter by saying "Please feel free to contact me with any questions or if Atrium Funding … would like to move forward at the purchase price of $5.1 million." (*Id.*). Sipala contends that this was an oversight and that he "intended—as stated in the body of the letter—to make a counteroffer of $4.6 million." (*Id.* ¶ 53). On December 15, 2011, Moran hand-delivered a letter to the Sipala Defendants indicating that Atrium Funding was "prepared to offer the aggregate price of $4,220,000" in exchange for the ESOP's Atrium shares. (*Id.* ¶ 51). "After reviewing the M & S Appraisal, and based on his many years of negotiating

stock and other deals, Sipala was satisfied that $4,220,000 reflected a fair price for the Atrium stock." (Pl. Cnt. Stmt. ¶ 64). Despite occupying the same office suite, Sipala and Moran never had a face-to-face negotiation. (Def. Cnt. Stmt. ¶ 52).

By way of a letter dated December 15, 2011, the Sipala Defendants recommended that, subject to receipt of a final fairness opinion from M & S, the ESOP Committee accept Atrium Funding's offer of $4,220,000 for the ESOP's Atrium stock and that the ESOP Committee "authorize [Sipala] to negotiate the Stock Purchase Agreement on behalf of [the ESOP]." (Pl. Cnt. Stmt. ¶¶ 65, 66). The ESOP Committee accepted the Sipala Defendants' recommendation and authorized the Sipala Defendants to negotiate a stock purchase agreement on the ESOP's behalf. (*Id.* ¶ 67). Sipala proceeded to negotiate the terms of a stock purchase agreement with Atrium Funding, through Moran. (*Id.* ¶ 68). On December 30, 2011, M & S issued a letter to the Sipala Defendants setting forth its opinion that $4,220,000 in exchange for the ESOP's Atrium shares "is fair, from a financial point of view, to the [ESOP] and provides at least adequate consideration to the [ESOP], as defined in Section 3(18) of ERISA." (*Id.* ¶¶ 72, 73). On December 30, 2011, Sipala, on behalf of the ESOP, and Peter Dejana, on behalf of Atrium Funding, executed a stock purchase agreement and Atrium Funding paid the ESOP $4,220,000 in exchange for the Atrium stock. (*Id.* ¶¶ 74, 75). Effective December 31, 2011, the Sipala Defendants resigned as the ESOP's "independent temporary trustee" and have not taken any action on behalf of the ESOP since. (*Id.* ¶¶ 76, 77). The Sipala Defendants never communicated with any ESOP participants concerning the sale of the ESOP's Atrium stock to Atrium Funding. (Def. Cnt. Stmt. ¶ 58).

### E. Alleged Error in the M & S Valuation

On November 1, 2003, Peter Dejana and Atrium entered an "employee split dollar collateral assignment life insurance agreement" ("Split Dollar Agreement") pursuant to which, *inter alia*: (i) Atrium "agree[d] to advance premiums of up to Three Million Seven Hundred Twenty Thousand Dollars ($3,720,000.00) per year to the benefit of [Peter Dejana] for ... life insurance ... for a period of up to Five (5) years as long as [Peter Dejana] [was] employed [by Atrium]"; (ii) Peter Dejana agreed to "execute a Five (5) year irrevocable collateral assignment of the [life insurance] Policy to [Atrium] ... [to serve as] security for the premium advances being made"; (iii) "at the end of the Five (5) year period of full employment of [Peter Dejana], [Peter Dejana was to] within Sixty (60) days of completion of the time period, either repay [Atrium] the entire balance of the premium advances ... or grant [Atrium] an irrevocable assignment of ... death benefit payable under the [life insurance] Policy in any amount sufficient to repay [Atrium] the full value of all premium advances..."; and (iv) the parties agreed that "all premium advances that ha[d] not been previously reimbursed must be reimbursed on the First (1st) day of the Two Hundred Forty–First (241st) month from [November 1, 2003]." (Def. Cnt. Stmt. ¶ 50).

In its valuation report, M & S noted that "[t]he primary asset of [Atrium] are the Split Dollar Officer's Life Insurance Premiums ... paid by Atrium on behalf of Mr. Peter Dejana," and that "[a]s of the valuation date, Atrium had fulfilled its obligation under the [Split Dollar] Agreement and paid on behalf of [Peter Dejana] a total of $18,600,000 ... in [life insurance] Premiums." (*Id.*). Rather than accounting for the fact that Peter Dejana

was obliged to repay the life insurance premiums in full by late 2023 pursuant to the Split Dollar Agreement, M & S: (i) "determined that the most likely event for the [return of] Premiums to [Atrium] would be upon the passing of [Peter Dejana] and subsequent redemption of the [life insurance] Policies"; (ii) "utilize[d] the IRS Mortality Tables to calculate a Conditional Death Probability at each period over the next 40 years [until June 30, 2051] to apply the expected cash inflow to [Atrium] in the form of a [return on] Premiums"; (iii) "multipl[ied] the Conditional Death Probability by the total Premiums paid ($18,600,000) to calculate the Probability Adjusted Expected Cash Inflow for each period of the analysis"; and (iv) "discount[ed] these projected cash inflows to their present values." (*Id.*). M & S concluded that "[a]pplying the above discount rate to the Probability Adjusted Cash Inflows, yields a value of $11,386,049 for the fair market value of the Split Dollar Officer's Life Insurance Premiums..." (*Id.*).

During his deposition, Kenneth Pia, a certified public accountant retained by Defendants to serve as a damages expert, testified that he did not "believe that it was correct in this circumstance" for M & S to assume a life insurance repayment date beyond 2023, the latest repayment date specified in the Split Dollar Agreement, and that he had "valued the life insurance asset at roughly $1,700,000 or so higher than [M & S]" utilizing "the date certain that it had to be repaid, ... 2023." (Pl. Cnt. Stmt. ¶ 42). In its 2008, 2009, and 2010 Atrium valuation reports, IVA took note of the fact that "the [life insurance] premium advances must be repaid to [Atrium] twenty (20) years after the [Split Dollar] Agreement date of November 25, 2003." (Feinberg Decl. (Dkt. 117–37), Ex. 23 at 29, Ex. 24 at 30, and Ex. 25 at 30).

### F. Alleged Conflicts of Interest

Plaintiffs contend that certain connections between Sipala on the one hand and Peter Dejana, Dejana Group companies, William Wynperle, and/or Robert Moran on the other rendered the Sipala Defendants' service as the ESOP's temporary trustee and the sale of Atrium stock to Atrium Funding "rife with conflicts of interest." (Plaintiffs' Memorandum in Support of its Motion for Partial Summary Judgment (Dkt. 117–1) ("Pl. Mov. Br.") at 1). Peter Dejana described Sipala as "a gentleman who from time to time rendered services to Dejana and affiliated companies." (Def. Cnt. Stmt. ¶ 19). Defendant Wynperle described Sipala as a "friend" whom he had known since both of them worked at a company called Butler Aviation in the 1980s. (*Id.* ¶ 20).

#### a. Snowlift

In April 2011, Dejana Industries was interested in acquiring Snowlift, LLC ("Snowlift"), one of its leading competitors. (*Id.* ¶ 21). At some point in April 2011, Peter Dejana and Wynperle met with Sipala to discuss Dejana Industries' potential acquisition of Snowlift and Sipala's proposed role in the transaction, which would initially consist of Saddle Creek sending a letter to Snowlift to determine if it was interested in being acquired. (*Id.* ¶ 21). Plaintiffs characterize Sipala's role in the attempted Snowlift acquisition as a "stalking horse" and the Sipala Defendants take umbrage with that term. (*Id.* ¶ 21). Peter Dejana, Wynperle, and Sipala also discussed the possibility of Sipala serving as Dejana Industries' "M & A advisor" if the proposed Snowlift acquisition came to fruition. (*Id.* ¶ 22).

Following their initial meeting, Sipala and Wynperle sent a series of emails to each other concerning how Sipala would structure Saddle Creek's initial letter to Snowlift. (*Id.* ¶ 23). In a May 10, 2011

email, Sipala indicated that he "fe[lt] that the initial conversation can not [sic] be to [sic] contrived or it will not come off as real." (*Id.* ¶ 24). On May 11, 2011, the Sipala Defendants sent a letter to Snowlift's CEO / owner attempting to gauge Snowlift's interest in being acquired. (*Id.* ¶ 25). On May 13, 2011, Sipala emailed Wynperle requesting both "the names of other companies that do Snow Removal or other aviation related services on the east coast" and "an update on the info requested for the ESOP." (*Id.* ¶ 32). In this email, Sipala also requested payment for his ESOP trustee services, saying that "[t]his amount was due at signing and for any other client I would do nothing until I got paid." (*Id.*). On May 18, 2011, Sipala emailed Wynperle requesting both approval of proposed "talking points" for his upcoming phone call with Snowlift's CEO / owner, and ESOP / Atrium-related information that Duff & Phelps had inquired about. (*Id.* ¶ 33). Soon thereafter, Sipala called Snowlift's CEO / owner to follow up on the May 11 letter; Snowlift's CEO / owner told Sipala that he was not interested in selling Snowlift. (*Id.* ¶ 25). On June 10, 2011, Saddle Creek billed Dejana Industries for its Snowlift-related work. (*Id.* ¶ 26).

### b. Sanchez Paving

In addition to Saddle Creek, Sipala owned Elite Financial Corporation ("Elite Financial"), a company "that provided leasing services." (Pl. Cnt. Stmt. ¶ 6). Beginning in 1997, Elite Financial entered a series of three-year contracts with Dejana Industries "pertaining to the leasing of certain snow melting equipment to" a Dejana Industries subcontractor called Sanchez Paving, "an entity that provided snow removal services at O'Hare International Airport in Chicago, Illinois." (Def. Cnt. Stmt. ¶ 27). Pursuant to the Elite Financial—Dejana Industries agreements, Elite purchased certain equipment from Dejana Industries and leased that equipment to Sanchez Paving; Dejana Industries, in turn, "look[ed] solely to the flow of payments from Sanchez to Elite [Financial] for its payments" and paid Elite Financial an annual fee of $10,000 to serve as an intermediary. (*Id.* ¶¶ 27—30). According to Peter Dejana, Dejana Industries preferred this arrangement to directly leasing equipment to Sanchez Paving "because Dejana or its affiliates didn't have the same comfort with Sanchez as with Sipala, not quite as upstanding as Sipala, in Dejana's opinion." (*Id.* ¶ 31). On September 21, 2011, Sipala emailed Wynperle asking whether he had "[a]ny word on the info for Atrium or the resolution of the Sanchez contract amendment." (*Id.* ¶ 34).

### c. Robert Moran

Sipala also had a relationship with Moran, "the longtime attorney for the Dejana [Group] Companies [who] has provided legal services to [Peter] Dejana on multiple occasions over the years." (Def. Cnt. Stmt. ¶ 13). Sipala first met Moran in the 1980s, when they were both working at a company called Butler International. (*Id.* ¶ 35). At all relevant times, Sipala and Moran occupied the same small office suite in Montvale, New Jersey. (*Id.* ¶ 12). "From time to time, Moran has performed legal services for several companies for which Sipala was performing advisory services." (*Id.* ¶ 15). Sipala has recommended that his clients hire Moran as their attorney. (*Id.* ¶ 40). In 2011, Sipala and Moran served as chairman and secretary, respectively, of MSRC Acquisition, Corp. ("MSRC"), a "mass storage solutions business located in New Hampshire," and both were directors of MSRC. (*Id.* ¶ 37).

During his deposition, Moran testified that he "believe[d] [he had] done some legal work for John [Sipala] over the years." (*Id.* ¶ 14). Moran filed incorpo-

ration papers for Saddle Creek's predecessor, Elite Investment Group, LLC, of which Sipala was co-founder, with the New Jersey Secretary of State; Sipala did not recall whether Moran prepared the corporate documents. (*Id.* ¶ 36). In a June 1, 2011 invoice issued to "Saddle River Capital," Moran billed Sipala for legal services performed on April 21, 2011, the day before Sipala executed the engagement agreement with the ESOP and Atrium to serve as independent temporary trustee; Sipala paid the invoice. (*Id.* ¶ 16). The invoice describes Moran's services as: "Discussions and advices [sic] telephone call with John Sipala regarding contract for Dejana; worked on same more discussions and advices [sic] regarding same; calls with John Sipala receipt and review document from John to review." (*Id.*). During his deposition, Sipala testified that, while he "guess[ed] anything's possible, .. [he did not] believe" that Moran's invoice reflected legal services related to his independent temporary trustee agreement with the ESOP and Atrium. (*Id.*). Sipala testified that his "belief is that ... it was for either the discussions [he] was having on Snowlift or another matter." (*Id.*). There was no draft written agreement concerning the Sipala Defendants' work on the Snowlift acquisition; apart from the temporary trustee engagement agreement, Sipala could not recall any other written contracts with any Dejana Group company that he was discussing or negotiating in April 2011. (*Id.*). Following his deposition, Sipala submitted a written declaration indicating that Elite Financial "had a contract with Dejana Industries that was up for renewal in that time period" and that Sipala "never discussed Saddle Creek's engagement as an independent trustee for the ESOP with Mr. Moran until [he] received Mr. Moran's December 6, 2011 letter." (*Id.* ¶ 17).

## II. APPLICABLE LAW

### A. Summary Judgment

 Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(c)), and "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Belton v. City of New York*, 629 Fed.Appx. 50, 50 (2d Cir. 2015) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A district court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotations omitted).

 In order to defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348) (emphasis and alteration in original); *see also R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) ("opposing party must provide concrete particulars showing that a trial is needed") (internal quotations omitted). "It is not sufficient merely to assert a conclusion without sup-

plying supporting arguments or facts." *BellSouth Telecommunications, Inc. v. W.R. Grace & Company–Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

■■■■ " 'The standard to be applied when deciding cross-motions for summary judgment is the same as that for individual motions for summary judgment and the court must consider each motion independent of the other.' " *Perez v. First Bankers Trust Services, Inc.*, 210 F.Supp.3d 518, 528, No. 12-cv-8648 (GBD), 2016 WL 5475997, at *7 (S.D.N.Y. Sept. 28, 2016) (quoting *McCabe v. Capital Mercury Apparel*, 752 F.Supp.2d 396 (S.D.N.Y. 2010)) (additional citations omitted). " 'Even when both parties move for summary judgment, asserting the absence of any genuine material fact, a court need not enter judgment for either party.' " *Id.* (quoting *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

## B. Fiduciary Duties under ERISA

■■ The ESOP, like other employee stock ownership and benefit plans, is subject to ERISA, "a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). Trustees of ERISA plans "have fiduciary obligations that have been described as 'the highest known to the law.' " *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982)). "[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation . . . with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). The parties do not dispute that, with respect to the ESOP, the Sipala Defendants were fiduciaries subject to ERISA.

### 1. Section 404

■■■■ Section 404 of ERISA, which "draw[s] much of [its] content from the common law of trusts," *Varity Corp. v. Howe*, 516 U.S. 489, 496, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (internal citations omitted), imposes upon fiduciaries "different although overlapping" duties of loyalty and care. *Bierwirth*, 680 F.2d at 271. In order to satisfy the duty of loyalty, an ERISA fiduciary must act "solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to [them] . . ." 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty requires fiduciaries to subordinate their own interests to those of plan participants in connection with their management of plan assets. *See, e.g., Bierwirth*, 680 F.2d at 271 (fiduciaries' "decisions must be made with an eye single to the interests of the participants and beneficiaries"); *McCabe*, 752 F.Supp.2d at 405 ("Because ERISA's primary goal of protecting employees' expectations of benefits can only be met if the interests of Plan administrators are subordinated to those of Participants, the duty of loyalty is perhaps ERISA's most fundamental fiduciary obligation.") (internal quotations, citations, and alterations omitted).

■■■ In order to satisfy the duty of care, an ERISA fiduciary must "discharge his duties . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of a like character and with like aims..." 29 U.S.C. § 1104(a)(1)(B). "In determining whether a fiduciary has satisfied this requirement, the court's task is to inquire whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the [transaction] and to structure the [transaction]." *Henry v. Champlain Enterprises, Inc.*, 445 F.3d 610, 618 (2d Cir. 2006) (internal quotations, citations, and alterations omitted). Where an ERISA trustee violates his fiduciary duties and the plan sustains losses as a result, plan participants may sue the trustee and the trustee may be liable to restore such losses to the plan, and the court may award other equitable or remedial relief, such as setting aside the transaction. *See* 29 U.S.C. §§ 1109(a), 1132; *see also Varity Corp.*, 516 U.S. at 507–15, 116 S.Ct. 1065.

### 2. Section 406

■ "Section 406 of ERISA supplements the general fiduciary obligations set forth in § 404 by prohibiting certain categories of transactions believed to pose a high risk of fiduciary self-dealing." *Henry*, 445 F.3d at 618. Pertinently, section 406 provides that "[e]xcept as provided in section [408] ... [a] fiduciary ... shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect ... sale or exchange ... of any property between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(A). A "party in interest" is defined as, *inter alia*, " 'an employee, officer, director, ... or a 10 percent or more shareholder directly or indirectly' of 'an employer any of whose employees are covered by [the] plan.' " *Id.* (quoting 29 U.S.C. § 1002(14)(H), (C) (alteration in original).

■ " 'Doubtlessly recognizing that the absolute prohibitions in Section 406 would significantly hamper the implementation of ESOPs, particularly by small companies, Congress enacted in Section 408 a conditional exemption from the prohibited transaction rules for acquisition of employer securities by ESOPs and certain other plans.' " *Id.* (quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1465 (5th Cir. 1983)). Under section 408(e), an ERISA plan may sell securities to a party-in-interest only if it receives "adequate consideration." 29 U.S.C. § 1108(e); *see Henry*, 445 F.3d at 618. Where, as here, the securities being sold to a party-in-interest are not publicly-traded and otherwise have no "generally recognized market," ERISA defines "adequate consideration" as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with the regulations promulgated by the Secretary [of Labor]." 29 U.S.C. § 1002(18)(B); *see Henry*, 445 F.3d at 618 (utilizing this definition for "transactions involving securities with no known market value"). The "fair market value" and "good faith" requirements are "closely intertwined" in that they are " 'expressly focused upon the *conduct* of the fiduciaries' " and both demand that a trustee approving the sale of an ERISA plan's securities or other assets be "well-informed about the asset and the market for that asset." *Henry*, 445 F.3d at 619 (quoting *Cunningham*, 716 F.2d at 1467) (emphasis in original).

■ Where ERISA plan participants challenge the sale of the plan's assets to a party-in-interest, the trustees approving the sale bear the burden of establishing that the plan received "adequate consideration" in exchange. *Id.* (citing 29 U.S.C. §§ 1002(18), 1108(e)). "The role of courts in reviewing the adequacy of consideration

in an ERISA case is to determine whether the fiduciary can show that the price [received] represented a good faith determination of the fair market value of the asset, 'not to redetermine the appropriate amount for itself *de novo*.'" *Id.* (quoting *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 437 (6th Cir. 2002)).

## III. THE PRESENT MOTIONS

### A. Section 406 Claim

The parties agree that the ESOP's sale of its Atrium stock to Atrium Funding constitutes an interested-party transaction proscribed by section 406. (*See* Memorandum of Law in Support of the Sipala Defendants' Cross–Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment (Dkt. 117–41) ("Def. Br.") at 12 n. 1; Plaintiffs' Memorandum of Law in Opposition to Sipala Defendants' Motion for Summary Judgment (Dkt. 117–64) ("Pl. Opp. Br.") at 9). Their dispute centers on whether the ESOP received "adequate consideration" from Atrium Funding in exchange for the Atrium shares, so as to fall within the section 408(e) exception. The Sipala Defendants correctly note that, in determining this issue of "adequate consideration," the Court must focus on their conduct in arriving at the $4,190,000 valuation and $4,220,000 sale of the ESOP's Atrium stock rather than evaluating the merits of the transaction in hindsight. (*See* Def. Br. at 13–16); *see also Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984). The Sipala Defendants argue that they are entitled to summary judgment on Plaintiffs' section 406 claim because they "acted in good faith by engaging M & S to complete a valuation of the ESOP, and were diligent in fulfilling their duties to ensure the sale was for adequate consideration." (Def. Br. at 16).

### 1. The Sipala Defendants' Reliance upon M & S

Where a trustee lacks the requisite education, experience, and/or skill to determine the fair market value of an asset on his own, it is proper, and indeed necessary, for the trustee to engage an independent valuation firm to assist. *See Bierwirth*, 680 F.2d at 272–73; *First Bankers Trust*, 210 F.Supp.3d at 529, 2016 WL 5475997, at *9. But a trustee does not automatically satisfy his duty to determine the fair market value of an asset in good faith prior to selling it to an interested party simply by hiring a valuation firm and relying blindly upon its advice. *See Bierwirth*, 680 F.2d at 272 (engaging independent expert and following his advice does not "operate as a complete whitewash which, without more, satisfies ERISA's prudence requirement"); *Cunningham*, 716 F.2d at 1474 ("An independent appraisal is not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are filled."); *First Bankers Trust*, 210 F.Supp.3d at 529, 2016 WL 5475997, at *9. Rather, an ERISA trustee properly relies upon an expert's advice where he "'(1) investigate[s] the expert's qualifications, (2) provide[s] the expert with complete and accurate information, and (3) make[s] certain that reliance upon the expert's advice is reasonably justified under the circumstances.'" *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 301 (5th Cir. 2000) (quoting *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996)) (additional citations omitted); *accord Chao*, 285 F.3d at 430; *First Bankers Trust*, 210 F.Supp.3d at 529, 2016 WL 5475997, at *9.

#### a. Did the Sipala Defendants adequately investigate M & S's qualifications?

The Sipala Defendants assert that, "[p]rior to selecting M & S, [they]

conducted a prudent investigation of several other firms by interviewing them [and] investigating their backgrounds, and chose M & S based on its reputation and credentials." (Def. Br. at 16). In their Local Rule 56.1 Counterstatement, Plaintiffs note that "the Sipala Defendants obtained bids from only two valuation firms and selected the valuation firm that quoted the lowest price," which appears to be true based upon Sipala's June 3, 2011 letter to Wynperle informing him that he had contacted four valuation firms, received quotes from two of them, and selected M & S. (Pl. Cnt. Stmt. ¶ 16). However, Plaintiffs do not argue that receiving bids from only two firms and choosing the less expensive of the two constitutes an inadequate investigation *per se*, or otherwise suggest that M & S was not qualified to perform the valuation. Nothing in the record suggests that the Sipala Defendants failed to investigate and consider M & S's qualifications prior to engaging it to perform the Atrium valuation.

### b. Did the Sipala Defendants provide M & S with complete and accurate information?

Plaintiffs argue that the Sipala Defendants unreasonably, and perhaps disingenuously, relied upon M & S's $4,190,000 valuation because, *inter alia*, "M & S requested copies of all prior appraisals of Atrium, but Mr. Sipala refused to provide copies of the IVA valuations to M & S." (Pl. Opp. at 16). The Sipala Defendants argue that: (i) "M & S removed ... 'copies of any prior appraisals' " from the document request list; (ii) "[d]uring the call with M & S, Sipala informed M & S that he did not wish to provide prior appraisals because he wanted M & S to perform an independent appraisal free from any bias"; (iii) "M & S agreed that it did not need the prior appraisals to perform a valuation of Atrium, as clients of M & S do not provide prior appraisals in order that M & S can have a 'fresh look' at the valuation"; and (iv) "M & S was aware of the prior valuations from the Form 5500s, which were filed by the ESOP annually with the Department of Labor, [and] could access those valuations if necessary." It is undisputed that Sipala made handwritten edits on M & S's document request list, including crossing out the request for "copies of any prior appraisals" and that he did not in fact provide M & S with the IVA reports, but the impetus for this is disputed. Sipala alone testified that "M & S amended the list" during his phone call with Gregory Feldman and James Sieman of M & S; Feldman did not testify to this and Sieman could not recall discussing M & S's request for prior appraisals with Sipala. As to the Sipala Defendants' argument regarding the Form 5500s, the record reflects only that Steve Susel of M & S saw Atrium's 2008 Form 5500, which noted only IVA's bottom-line valuation of Atrium for that year and contained none of the analysis set forth in the IVA report. There are thus triable questions concerning why the Sipala Defendants did not provide M & S with the prior IVA reports, whether M & S in fact had access to all relevant Form 5500s, and whether the Form 5500s were a reasonable substitute for the actual IVA reports.

The parties also dispute whether it was proper, as a matter of professional valuation practice, for M & S not to review the 2008, 2009, and 2010 IVA reports. The Sipala Defendants contend that the prior IVA appraisals were "deemed unnecessary" by M & S and that their "decision to have M & S provide its own 'fresh' and independent appraisal demonstrates their due diligence in fulfilling their fiduciary obligations." (Def. Br. at 23). During his deposition, Sieman testified that, while he could not recall why the Sipala Defendants

did not provide him with the IVA reports, "it's not uncommon for [clients] not to send prior appraisals" and that he has worked with "several clients who have not done that before because they want kind of a fresh look at the valuation." (Pl. Cnt. Stmt. ¶ 51). However, during his deposition, Kenneth Pia, the certified public accountant retained by Defendants to serve as a damages expert, testified that it is standard practice for his valuation firm to request prior valuation reports and that prior valuations allowed his firm to, *inter alia*, "make sure that we understand what the result was and whether or not we have to reconcile our result..." (*Id.* ¶¶ 25, 38). Pia testified that he had worked on 70 to 80 ESOP transactions during the previous decade and had reviewed prior appraisals in each instance they were available. (*Id.*). While "[i]t is axiomatic that a fiduciary is not required to provide its valuation advisor with *irrelevant* information," *First Bankers Trust*, 210 F.Supp.3d at 532, 2016 WL 5475997, at *11 (emphasis in original), the parties dispute the relevance of the IVA reports. There are triable questions regarding the propriety of a trustee opting not to provide its valuation advisor with prior valuation reports and of a valuation firm not reviewing prior valuation reports when they are readily available.

### c. Did the Sipala Defendants justifiably rely upon M & S's valuation?

 "[A] fiduciary reviewing a valuation report 'is required to make an honest, objective effort to read the valuation, understand it, and question the methods and assumptions that do not make sense.' " *Id.* (quoting *Shay*, 100 F.3d at 1490). Plaintiffs argue that the Sipala Defendants unreasonably relied upon the M & S valuation and "failed to spot errors ... that would have been obvious if Mr. Sipala had reviewed the prior IVA valuations or carefully reviewed Atrium's material agreements and plan documents." (Pl. Opp. Br. at 17). Plaintiffs argue that Sipala failed to spot, among other things, M & S's seemingly erroneous assumption that Atrium might not be repaid for the life insurance premiums it advanced to Peter Dejana under the Split Dollar Agreement until as late as 2051 where the Split Dollar Agreement obliged Peter Dejana to repay the premiums by no later than the end of 2023. (*See id.* at 17–20).[4] Plaintiffs contend that Sipala would have spotted this error had he reviewed the IVA reports and/or the Split Dollar Agreement itself, and that, apparently based upon Kenneth Pia's valuation, "all Parties agree" that M & S's "serious error ... lowered the valuation by about $1.7 million." (*See id.*).

Beyond the specific alleged errors in the M & S valuation, which the Sipala Defendants do not address, Plaintiffs argue more generally that "[a] prudent fiduciary would have been troubled by the $3 million difference in the IVA and M & S valuations, and would have compared the two valuation reports to determine why they reached such different conclusions." (*Id.* at 15). The Sipala Defendants argue that Sipala was not concerned with the disparity between the 2010 IVA valuation of

---

4. Plaintiffs also argue that M & S made other errors, including: (i) failing to "address the appropriate interest rate for determining the present value of the deferred compensation liability"; and (ii) "us[ing] monthly accruals to credit Mr. Dejana with four months of deferred compensation for the Plan Year ending July 31, 2012" rather than following "the annual accrual requirement in the Deferred Compensation Plan document," which "resulted in a significant overstatement of Atrium's liability." It is unnecessary to delve into the details of these alleged errors at this stage. The purported error concerning the insurance premium repayment appears to have had the most significant impact on the overall valuation.

$7,524,000 and M & S's valuation of $4,190,000 because "he thought the prior valuation conducted by IVA showed a higher fair market value because it did not apply the proper standard." (Sipala Defendants' Reply Memorandum of Law in Further Support of their Cross–Motion for Summary Judgment (Dkt. 117–83) ("Def. Reply Br.") at 11). During his deposition, Sipala testified that he believed the IVA "appraisals were done ... purely for financial statement purposes" and that he "did not know" that they intended to measure "fair market value." (Def. Cnt. Stmt. ¶ 49). The IVA reports, however, explicitly state that they were calculating "fair market value," and it is not clear why Sipala might have believed otherwise. Plaintiffs have offered credible facts and testimony that would allow a reasonable jury to conclude that the M & S report contained errors that operated to lower the value of Atrium and that the Sipala Defendants unreasonably failed to detect these errors.

In sum, there are genuine disputes regarding whether the Sipala Defendants provided M & S with complete and accurate information and whether the Sipala Defendants' reliance upon M & S's valuation was reasonably justified, and thus whether the ESOP received "adequate consideration" in exchange for the Atrium shares. The Sipala Defendants are not entitled to summary judgment on Plaintiffs' section 406 claim.

## B. Section 404 Claim
### 1. Sipala Defendants' Motion

The Sipala Defendants argue that "there are no material facts to support" Plaintiffs' claims that the Sipala Defendants breached either the duty of care or loyalty, and that they are thus entitled to summary judgment on Plaintiffs' section 404 claim. (Def. Br. at 17; see generally id. at 17–25). The Court finds that the record does contain such material facts and that summary judgment in the Sipala Defendants' favor on Plaintiffs' section 404 claim is unwarranted.

Because the duties of loyalty and care under section 404 are "different although overlapping standards," Bierwirth, 680 F.2d at 271, it is appropriate to first consider whether the Sipala Defendants' conduct in connection with the ESOP's sale of its Atrium stock met the duty of care standards imposed upon ERISA fiduciaries. The Sipala Defendants contend that they "acted with the care, skill, prudence, and diligence under the circumstances in working with M & S to employ the appropriate methods to investigate the merits of the sale," so as to satisfy section 404(a)(1)(B)'s duty of care requirements. (Def. Br. at 23). The Court has considered the Sipala Defendants' conduct in connection with the ESOP transaction and has determined that there are triable disputes regarding whether the Sipala Defendants determined the fair market value of the Atrium stock in good faith, so as to render the ESOP transaction eligible for the section 408 exception. For the same reasons, there are triable disputes regarding whether or not the Sipala Defendants satisfied the duty of care standards set forth in section 404(a)(1)(B). See First Bankers Trust, 210 F.Supp.3d at 529, 2016 WL 5475997, at *8 ("Evaluating whether a fiduciary has acted in 'good faith' to determine an asset's fair market value overlaps substantially with the duty of care inquiry.") (citing Eyler v. Comm'r, 88 F.3d 445, 455 (7th Cir. 1996)).

As to Plaintiffs' duty of loyalty claim, the Sipala Defendants begin by arguing they were permitted to engage in transactions unrelated to their role as temporary trustee for the ESOP and that ERISA's fiduciary standards did not govern such separate transactions. (See id. at 17–21).

For example, they correctly argue that "[t]he [ERISA] statute does not provide ... that a person or entity that is a fiduciary for some purposes—here, overseeing the valuation and sale of the ESOP shares—is bound by strict fiduciary duties in all of its other business activities." (*Id.* at 18). Thus, according to the Sipala Defendants, "neither Sipala's relationship with Moran, nor his independent transactions with the Dejana Companies were prohibited by the [ERISA] statute." (*Id.* at 20; *see also id.* at 21) ("neither the unrelated actions of the Sipala [Defendants] with regard to a potential acquisition ... of Snowlift ... nor an unrelated equipment lease arrangement ... violated any duty the ... Sipala [Defendants] owed to Plaintiff[s]").

█ It is true that Sipala's friendship / business relationship with Moran and his separate business dealings with Peter Dejana and/or the Dejana Group companies did not impose a *per se* bar on the Sipala Defendants serving as temporary trustee for the ESOP. *See, e.g., Friend v. Sanwa Bank California*, 35 F.3d 466, 469 (9th Cir. 1994) ("Congress never intended section 1104(a)(1) to establish a per se rule of fiduciary conduct ... and no court has established such a violation. Therefore, we hold that a trustee does not necessarily violate section 1104(a)(1) by accepting a trusteeship with dual loyalties."). However, an ERISA trustee does violate section 404's duty of loyalty requirement when he elevates his separate business interests above the interests of plan participants to their detriment. *See Bierwirth*, 680 F.2d at 271–76. In this regard, the Sipala Defendants argue that "[t]here is not a shred of evidence that the exercise of [the Sipala Defendants'] fiduciary functions ... were influenced by Sipala's unrelated business transactions with Dejana or his contacts

with Moran." (Def. Br. at 22). The Court disagrees.

It is undisputed that: 1) Sipala was friends with Wynperle, the executive vice president and secretary of Atrium, Dejana Industries, and various other Dejana Group companies; 2) at the same time he was performing ESOP-related work, Sipala worked with Peter Dejana in connection with Dejana Industries' contemplated acquisition of Snowlift, and hoped to serve as Dejana Industries' "M & A advisor" if the acquisition came to fruition; 3) from 1997 through the time he was performing ESOP-related work, Sipala, via his company Elite Financial, served as an intermediary between Dejana Industries and Sanchez Paving in an indirect equipment leasing arrangement, for which Dejana Industries paid Elite Financial $10,000 per year; 4) Sipala and Wynperle intermingled their Snowlift- and Sanchez Paving-related communications with their ESOP-related communications; and 5) Sipala had a longstanding business relationship with Moran, his counterparty in the Atrium stock sale negotiations, they occupied the same office space, and Moran billed Sipala for legal services "regarding contract for Dejana" performed on April 21, 2011, the day before Sipala executed the engagement agreement to serve as the ESOP's temporary trustee.

█ As discussed above, there are triable disputes regarding whether the Sipala Defendants made a good-faith effort to determine the fair market value of Atrium stock before recommending that the ESOP sell its Atrium shares to Atrium Funding for $4,220,000. Most notably, there are triable questions surrounding the reasonableness of Sipala's decision to withhold the IVA valuation reports from M & S and the reasonableness of his reliance upon M & S's $4,190,000 valuation in light of IVA's $7,524,000 valuation from the pre-

vious year. Even if Sipala did in fact want M & S to take a "fresh" look at Atrium without the influence of the IVA reports, the reasonableness of which is in dispute, it is not clear from the present record why Sipala chose not to provide M & S with the IVA reports *after* M & S had issued its valuation so that M & S could attempt to ascertain the reasons for the more-than-$3 million discrepancy. "The duty of loyalty is grounded in the motivation driving a fiduciary's conduct..." *First Bankers Trust*, 210 F.Supp.3d at 534, 2016 WL 5475997, at *13. Should it be determined at trial that the Sipala Defendants' conduct in ascertaining Atrium's value and negotiating its sale price failed to satisfy section 404's duty of care standards, it might also be reasonably determined that Sipala's separate business interests and relationships with Peter Dejana and Moran tainted his decisionmaking as the ESOP's trustee to the detriment of the ESOP and its participants. Consequently, the Sipala Defendants have not demonstrated that they are entitled to summary judgment on Plaintiffs' duty of loyalty claim.

### 2. Plaintiffs' Motion

Plaintiffs seek summary judgment only on their section 404 duty of loyalty claim. The crux of Plaintiffs' duty of loyalty argument is as follows: "The complex web of relationships between Defendant Sipala and Peter Dejana created a reasonably foreseeable risk of conflict between Mr. Sipala's fiduciary duties to the ESOP and his personal interests such that he could not serve as the Independent Temporary Trustee. Therefore, Sipala Defendants breached their duty of loyalty by representing the ESOP participants and beneficiaries in the 2011 ESOP transaction." (Pl. Mov. Br. At 16). Plaintiffs do not cite any authority supporting their proposition that an ESOP trustee violates the duty of loyalty immediately upon accepting the trustee appointment by dint of the fact that he has separate affiliations with individuals whose interests are adverse to those of the ESOP. In fact, the law is the opposite. *See Sanwa Bank California*, 35 F.3d at 469 (9th Cir. 1994) ("Congress never intended section 1104(a)(1) to establish a per se rule of fiduciary conduct ... and no court has established such a violation. Therefore, we hold that a trustee does not necessarily violate section 1104(a)(1) by accepting a trusteeship with dual loyalties.").

Plaintiffs rely upon *Bierwirth* to argue that "conflicts of interest precluded Sipala Defendants from serving as 'Independent Temporary Trustee.'" (Pl. Mov. Br. at 18). In *Bierwirth*, the ERISA plan trustee-defendants were also officers of Grumman Corporation, the employees of which were plan participants. 680 F.2d at 265–68. When Grumman's competitor made an offer to purchase the majority of Grumman's voting shares in connection with its plan to merge the two companies, the trustee-defendants rejected the offer, elected not to sell the Grumman shares held by the ESOP, and purchased additional Grumman shares on behalf of the ESOP at an unfavorable price in an effort to thwart a hostile takeover effort. *Id.* at 265–69. The Second Circuit held that, because ERISA trustees must act with an "eye single to the interests of [plan] participants and their beneficiaries," they also have a duty "to avoid placing themselves in a position where their acts as officers or directors of the corporation will *prevent* their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan." *Id.* at 271 (emphasis added). Without explicitly holding as much, the Second Circuit noted that there "is much to be said for the Secretary[ ] [of Labor's] argument that ... the only proper course was for the trustees to immediately resign so that a neutral trustee or

trustees could be swiftly appointed to serve for the duration of the tender offer" given that it was "almost impossible to see how [the trustee-defendants] could have voted to tender or even sell the Plan's stock, no matter how compelling the evidence for one or the other of those courses might have been." *Id.* at 271–72. The *Bierwirth* Court was "not, however, required to go so far in [that] case" because the record contained evidence that the trustee-defendants failed to investigate the merits of the proposed merger before taking various actions to oppose it, including purchasing additional Grumman stock on behalf of the ERISA plan at an unfavorable price, in breach of the duty of care. *Id.* at 272–75. In light of the fact that the *Bierwirth* trustee-defendants' own careers may have been jeopardized by a takeover of Grumman, the Second Circuit noted that it was "almost impossible to believe that ... their motive for purchasing the additional shares was for any purpose other than blocking the [competitor's] offer." *Id.* at 275; *see id.* at 272 n. 9 (noting that, in the event of a merger, two of the defendants stood to lose their jobs entirely and one of the defendants would become the CEO of corporate division rather than a whole company).

The record contains evidence that Sipala's company, Elite Financial, was paid $10,000 annually by Dejana Industries to serve as an intermediary between Dejana Industries and Sanchez Paving in an indirect equipment leasing arrangement, that Sipala hoped to serve as Dejana Industries "M & A advisor" in the event that it successfully acquired Snowlift, and that Sipala was friendly with Moran and Wynperle. Nothing in the present record suggests that Sipala stood to lose, or believed he stood to lose, any of these things if he did not orchestrate the sale of the ESOP's Atrium stock to Atrium Funding at an artificially low price. This is in contrast to the trustee-defendants in *Bierwirth*, whose concerns that they would suffer adverse career consequences in the event of an acquisition drove their decision to purchase more Grumman stock on behalf of the ERISA plan to the detriment of the plan and its participants. Additionally, in *Bierwirth*, it was evident that the trustee-defendants had breached the duty of care by failing to investigate the merits of a merger. *Id.* at 272–74. By contrast, as discussed above, there are triable disputes concerning the Sipala Defendants' adherence to ERISA's duty of care standards— most notably, whether it was prudent for the Sipala Defendants to rely upon M & S's valuation where M & S did not have access to IVA's recent and substantially higher valuations. Given that the duties of loyalty and care are "different although overlapping," *Bierwirth*, 680 F.2d at 271, it would make no sense to conclude that the Sipala Defendants were motivated by separate business and/or personal interests to perform their trustee-related duties in an imprudent manner *before* determining that they performed their trustee-related duties in an imprudent manner. Accordingly, Plaintiffs have not demonstrated that they are entitled to summary judgment on their section 404 duty of loyalty claim.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is denied and the Sipala Defendants' cross-motion for summary judgment is denied.

**SO ORDERED.**